# Exhibit 4

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3                 MARSHALL DIVISION

4

5   CYWEE GROUP LTD.,                    )
                                         )
6            Plaintiff,                  )
                                         ) Case No.
7       vs.                              ) 2:17-CV-00140
                                         ) -RWS-RSP
8   SAMSUNG ELECTRONICS CO., LTD., )
    AND SAMSUNG ELECTRONICS             )
9   AMERICA, INC.,                       )
                                         )
10           Defendants.                 )
    _____)

11

12

13

14

15               DEPOSITION OF

16        JOSEPH J. LAVIOLA, JR., PH.D.

17              Orlando, Florida

18          Wednesday, March 7, 2018

19

20

21

22  Reported by:

23  RHONDA HALL-BREUWET, RDR, CRR, LCR, CCR, FPR,

24  CLR, NCRA Realtime Systems Administrator

25  JOB NO. 138800

1

2

3

4                        March 7, 2018

5                        8:05 a.m.

6

7

8            Deposition of JOSEPH J. LAVIOLA,

9    JR., PH.D., held at the Doubletree, 12125 High

10   Tech Avenue, Orlando, Florida 32817, before

11   Rhonda Hall-Breuwet, Registered Diplomate

12   Reporter, Certified Realtime Reporter, Licensed

13   Court Reporter (TN), Certified Court Reporter

14   (GA and LA), Florida Professional Reporter,

15   Certified Livenote Reporter, NCRA Realtime

16   Systems Administrator, and Notary Public of the

17   State of Florida.

18

19

20

21

22

23

24

25

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     squeeze it and it'll move and change its

3     shape, right?

4          Then you can have something like a

5     tennis ball, which is somewhat harder; and

6     you can still squeeze it, but it takes more

7     force to do so.  Right?

8          So depending on the object itself

9     that is nonrigid, it will affect how much

10    force you need to apply to change its shape.

11       Q.   But just in terms of, like, moving

12    an object from Point A -- say, like the front

13    of this table to the end of this table, it

14    doesn't matter -- well, let me ask you, does

15    it matter -- if I have a phone that's on the

16    front of this table and I just push it to the

17    end of this table, does it matter if what's

18    pushing it is a rigid body or a nonrigid

19    body?

20          MR. RAFILSON:  Objection.  Form.

21       A.   It only matters if -- it could

22    matter, depending on a number of factors.  So

23    if I have a phone and I push it across the

24    table, one end to the other -- right? -- or

25    it's being pushed by an object and that

1      JOSEPH J. LAVIOLA, JR., Ph.D.

2  object is nonrigid, depending on the object,

3  it could affect the motion of the rigid body.

4  But there's lots of variables that would come

5  into play.

6  BY MR. CHEN:

7     Q.   But -- are you okay?

8     A.   Yeah, I'm fine.

9     Q.   But whether the object that is

10  pushing the phone is rigid or nonrigid is a

11  factor that you have to take into account?

12       MR. RAFILSON:  Objection.  Form.

13     A.   If -- if there was an object -- such

14  an object that was rigid or nonrigid and you

15  were, you know, requiring enough force to

16  push a phone from one end of the table to the

17  other, there would be -- the calculations

18  would be different in calculating the

19  collision and the responsive force.

20  BY MR. CHEN:

21     Q.   Okay.  I just want to run a

22  real-world example by you just to make sure

23  I've got the concept right.

24     A.   Okay.

25     Q.   So, like, a steel bar is a rigid

1     JOSEPH J. LAVIOLA, JR., Ph.D.

2  body?

3      A.   Yes.

4      Q.   And, like, a phone is also a rigid

5  body?

6      A.   Uh-huh.

7      Q.   They're both made of metal --

8      A.   Yeah.

9      Q.   -- essentially.  So if the force

10  that's affecting the phone and pushing it

11  from one end of this table to the other is

12  that steel bar, that's different than if I

13  just use my arm and I go like -- I push it?

14      A.   The force isn't different.  It would

15  be the amount of force that would be needed.

16  So given a rigid body such as a steel bar and

17  you were to hit a phone and move it across

18  the table versus using your hand, there may

19  be a difference in the amount of force needed

20  to move the phone in the same -- the same

21  distance.

22      Q.   Is that the only difference, just

23  the amount of force?

24      MR. RAFILSON:  Objection.  Form.

25      A.   At the end of the day, yeah.

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     BY MR. CHEN:

3          Q.   Does it matter how complex the

4     movement is?  Let me just give you an

5     example.

6               Like, if it's a steel bar, it's sort

7     of just one point of contact.  But if it's,

8     like, my arm, it's sort of my elbow and my

9     wrist, and they're all kind of moving at the

10    same time to affect that force, does that

11    make a difference?

12              MR. RAFILSON:  Objection.  Form.

13         A.   No, not really.

14    BY MR. CHEN:

15         Q.   Why doesn't it make a difference?

16         A.   Because it's still a force that's

17    being applied to the object.  You may need to

18    calculate that force a little differently

19    because of -- you have, you know, different

20    moving parts, but it's still a force that is

21    being calculated and acting on the object

22    that is moving.

23         Q.   Well, let's focus on the

24    calculations.  How are the calculations

25    different?

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2        A.    So you would have to -- so what

3    you're effectively talking about with, for

4    example, an arm is, there are degrees of

5    freedom related to that particular object.

6    Right?  So I've got an elbow, so there's a

7    degree of freedom there, a wrist, fingers.

8    And if I was to get a correct calculation of

9    the force, I would have to understand what

10   the forces were that were emanating related

11   to the elbow, the wrist, and the fingers.  So

12   it would be a more complex calculation --

13   right? -- if I was to want to give a truly

14   accurate force that was being applied.

15       Q.    And that's a different calculation

16   than just a steel bar?  Like, the steel bar

17   is sort of a simpler calculation?

18       A.    It's not necessarily a different

19   calculation; it's a more complex calculation

20   using the same principles.

21       Q.    Because there's more to take into

22   account because there's degrees of freedom in

23   the wrist?

24       A.    Yeah.  I mean, the laws of physics

25   are the laws of physics.

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2        Q.    So these calculations when the -- so

3   when you're saying the force is the same when

4   the object is being affected by a rigid

5   versus nonrigid body, the force is the same,

6   but the calculations are a little different;

7   is that right?

8             MR. RAFILSON:   Objection.   Vague.

9        A.    The calculations would be modified

10  to reflect the -- well, it depends.   If

11  you're talking about minute details about the

12  force, the calculations might be different.

13  If you're talking about, you know -- it

14  really depends on the level of accuracy that

15  you want to have with the forces that you're

16  trying to calculate.

17             So on the one hand, if you're trying

18  to be very accurate, extremely accurate, then

19  you would have to take into account some of

20  these other forces that relate to the object

21  that's pushing it.   But if you're just trying

22  to, you know, get a general representation of

23  the force that's moving, you know, those

24  could be neg-  -- I can't say that word --

25  negligible.

1      JOSEPH J. LAVIOLA, JR., Ph.D.

2           And it turns out, actually, that,

3   from the rigid body's perspective, it doesn't

4   really make that much of a difference because

5   the sensor is in the object that's being

6   moved.  So it's just going to sense force.

7   Doesn't really care where it comes from.

8   BY MR. CHEN:

9        Q.   From the rigid body's perspective --

10       A.   Yes.

11       Q.   -- but the calculations that you

12   have to do to --

13       A.   So if I was to calculate the forces

14   of the object that was moving, that was

15   pushing the other object, then there would be

16   some subtleties in how I would do that.  If

17   I'm calculating the forces or the

18   accelerations, for example, which are really

19   just forces, from the rigid body's point of

20   view that's being moved, it doesn't really

21   make any difference how that movement is

22   going to measure the force and take that into

23   account as a part of whatever it's doing for

24   calculating the motion of that body.

25       Q.   Are you talking sort of about the

1    JOSEPH J. LAVIOLA, JR., Ph.D.

2   magnitude and force or --

3       A.   Well, magnitude and direction.

4       Q.   Why doesn't it matter in terms of

5   direction?

6       A.   Because the -- if this is my rigid

7   body -- okay? -- and I have sensors in it

8   that are going to measure, for example,

9   forces acting on it -- right? -- it's going

10  to be measured forces from whatever, you

11  know, direction.  It doesn't -- there's no

12  relevance to how those forces are being

13  calculated on the object.  It's just going to

14  sense the forces that are acting on it.  If

15  you're talking about trying to calculate the

16  force -- the forces of the object that is

17  actually moving the body, that's different.

18      Q.   So in terms of the rigid object that

19  has sensors on it, it doesn't know what

20  object is affecting that force?

21      A.   Doesn't matter -- the force or any

22  other -- well, the object will measure

23  whatever quantities that are -- that the

24  sensors in it support.

25      Q.   So it just comes up with a value

Page 36

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2   regardless of what object is affecting that

3   force?

4        A.   Yes.

5        Q.   And that value tells you nothing

6   about whether the object affecting that force

7   was rigid or nonrigid?

8        A.   That's right.

9        Q.   And it doesn't tell you anything

10  about -- for example, if my arm was affecting

11  that force, it doesn't tell you anything

12  about my wrist or my elbow or my shoulder and

13  all those components that affect that force?

14       A.   No.

15       Q.   It's just a value that comes up in

16  the sensor?

17       A.   Uh-huh.

18       Q.   Turn back to Claim 1.  I want to get

19  a sense of the process flow of this claim, if

20  that makes sense.

21       A.   Yeah.

22       Q.   So you have a 3D pointing device

23  that has a housing.  There is a printed

24  circuit board enclosed by that housing.

25  What's attached to that housing is a six-axis

JOSEPH J. LAVIOLA, JR., Ph.D.

1  sensor?

3     A.   It's not attached to the housing;

4  it's attached to the printed circuit board.

5     Q.   Right.  Attached to the printed

6  circuit board.

7          And that has a rotation sensor that

8  detects angular velocities, and it also has

9  an accelerometer for detecting axial

10 accelerations; is that right?

11         MR. RAFILSON:  Objection.  Compound.

12 Objection.  Document speaks for itself.

13         You can answer.

14    A.   Yeah, that's what it says in the

15 claim.

16 BY MR. CHEN:

17    Q.   And rotation sensors were in the

18 prior art at the time of the invention of the

19 '438 patent; is that correct?

20    A.   Uh-huh.

21    Q.   And so were accelerometers; is that

22 correct?

23    A.   Yes.

24    Q.   And if you turn to the next page on

25 Column 19, it talks about how these first and

1       JOSEPH J. LAVIOLA, JR., Ph.D.

2       A.   Yeah, that's the only place in the

3   patent that actually provides those equations

4   which represent an extended Kalman filter.

5       Q.   So Equations 5 through 11 are the

6   only place in the patent that tell you how to

7   do the enhanced comparison method?

8            MR. RAFILSON:   Objection.   Misstates

9       testimony.

10      A.   Actually, the enhanced comparison

11  method requires not just Equations 5 through

12  11 but, actually, at a minimum, requires

13  Equations 1, 2, 3, and 4.

14  BY MR. CHEN:

15      Q.   So, at a minimum, what are all the

16  equations that are required to do --

17      A.   At a minimum, 1 through 11.

18      Q.   Is there anything else that's

19  required to do the extended Kalman filter?

20      A.   There are -- as I stated in my

21  declaration, there are things in the -- that

22  anybody of ordinary skill in the art who

23  understand the extended Kalman filter would

24  know that are not explicitly described in

25  the -- in the patent in Equations 5

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2    through -- 1 through 11.

3        Q.   So are those things -- I guess what

4    are those things that a person would know?

5        A.   For example, how to set up the

6    measurement noise, how to set up the process

7    noise, how to initialize the filter or the

8    method, how to represent the process in the

9    measurement models.

10       Q.   So are these specific equations or

11   just setup variables?

12       A.   Yeah.  Yeah.  The extended Kalman

13   filter is a general framework.  So there is

14   -- anyone of ordinary skill in the art would

15   understand that it is a general framework,

16   and, therefore, there are lots of ways to set

17   it up.

18       Q.   And Kalman filters were well-known

19   in the art at the time of the --

20       A.   Yes.

21       Q.   -- invention of the '438 patent,

22   correct?

23       A.   Yeah.

24       Q.   And so were extended Kalman filters?

25       A.   Uh-huh.

Page 43

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2            MR. CHEN:  Do you want to take a

3        quick --

4            MR. RAFILSON:  Sure.  Yeah.

5            MR. CHEN:  -- ten-minute break?

6            MR. RAFILSON:  Sure.

7            (Break taken from 9:06 a.m. to

8            9:18 a.m.)

9   BY MR. CHEN:

10       Q.   Look back at Exhibit 3, which is the

11  '438 patent, and let's take a look at Claims

12  14 and 19 now.  It's the very last page.

13  Take a look at those, and tell me when you're

14  done.

15       A.   (Reviewing document.)

16            Okay.

17       Q.   So Claims 14 and 19 are identical to

18  each other; is that right?

19            MR. RAFILSON:  Objection.  Form.

20       Objection.  The document speaks for

21       itself.

22       A.   On initial reading of it just now,

23  they look very similar.

24  BY MR. CHEN:

25       Q.   Okay.  So let's just take Claim 14

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   to be representative.  So Claim 14, like

3   Claim 1, also talks about obtaining a set of

4   angular velocities; is that right?

5        A.   Yeah.

6        Q.   And like Claim 1, it also talks

7   about obtaining a set of measured axial

8   accelerations?

9        A.   Uh-huh.

10       Q.   What is different, though, is that

11   it talks about calculating predicted axial

12   accelerations based on measured angular

13   velocities?

14       A.   Uh-huh.

15       Q.   How do you calculate a predicted

16   axial acceleration?

17            MR. RAFILSON:  Objection.  Form.

18       A.   You calculate it -- it's actually in

19   the patent.  If you go to Column 12 -- and

20   Column 12 takes -- if you go to Equation 1,

21   it shows how you take the angular velocities

22   to calculate the -- what is called -- known

23   as the second quaternion in the patent, and

24   that quaternion is then used in Equations 2,

25   3, and 4 to compute to predicted axial

1       JOSEPH J. LAVIOLA, JR., Ph.D.

2   accelerations.

3   BY MR. CHEN:

4       Q.   Can you run through how this

5   equation works?  Let's start with Equation 1.

6       A.   So Equation 1 starts off with --

7   this is the standard equation, differential

8   equation, for a -- the propagation of a

9   quaternion through time.  Okay?  And angular

10  velocity represents the derivative of

11  orientation.  Okay?  So we're taking

12  derivative of orientation, angular velocity,

13  and multiplying it by the initial quaternion,

14  and that is going to give you an updated

15  quaternion.  Okay?

16          If you -- and then once you have

17  that, then you can use the various components

18  of the quaternions, the new quaternion that

19  you calculated, to compute the individual

20  components of the axial accelerations.

21      Q.   So let me just step back.  What's a

22  quaternion?

23      A.   A quaternion is a representation for

24  orientation that's comprised of four numbers.

25  The four numbers include a vector,

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     three-dimensional vector, and a scale of

3     value to represent an axis and angle.

4          Q.   So what do -- what do converting

5     values into quaternion format allow you to

6     do?

7               MR. RAFILSON:   Objection.   Form.

8          A.   They provide a different

9     representation that is somewhat easier to

10    work with under various -- under different

11    circumstances.

12    BY MR. CHEN:

13         Q.   Can you give me some examples of why

14    it's easier?

15         A.   They're easier to use in the context

16    of matrix vector notation, which is common

17    notation, and tools used in the enhanced

18    comparison method that was described here.

19    They also help to deal with ambiguities that

20    you find in Euler angles, E-U-L-E-R.

21         Q.   What is matrix vector notation?

22         A.   Matrix vector notation is just a

23    notation that is often used where a matrix is

24    a sequence of numbers in -- typically, a

25    two-dimensional column, and a vector is often

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   a one-dimensional column with numbers, and

3   you can multiply them together to do various

4   things.

5        Q.   So --

6        A.   You can multiply, add, and subtract,

7   various, you know, mathematical things that

8   you can do with them.

9        Q.   So it's sort of a notation, just

10   allows you to do basic mathematical

11   calculations?

12        A.   Linear-algebra-type mathematics,

13   among other things.

14        Q.   So you said quaternions deal with

15   ambiguities.  What kind of ambiguities are

16   you talking about?

17        A.   So Euler angles, for example, go

18   from zero to 360.  Zero and 360 are the same

19   value, orientation.  So, you know, there's

20   ambiguity there.  Quaternions allow you to

21   circumvent that ambiguity by putting it into

22   a form that simply just provides an axis and

23   an angle.

24        Q.   In terms of just orientation, are

25   there any other ambiguities that quaternions

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2    allow you to take care of?

3         A.   That's the principal one.

4         Q.   Are there secondary ones?

5         A.   No.  Off the top of my head, I would

6    say that's -- if there are, they're not very

7    common.  I'm not aware of them.  The primary

8    reason you do this is because of the

9    ambiguities with the nonlinearities of the

10   Euler angles.

11             THE REPORTER:  I'm sorry.  The

12        ambiguities of the --

13             THE WITNESS:  Of the Euler angle

14        representation.

15   BY MR. CHEN:

16        Q.   So the principal reason you use

17   quaternions is to deal with the zero-to-360

18   ambiguity of the Euler angles?

19             MR. RAFILSON:  Objection.  Form.

20        A.   Yeah, that's one of the primary

21   reasons.  It also makes it easier to do

22   things like interpolation between

23   orientations.

24   BY MR. CHEN:

25        Q.   Can you tell me what you mean by

JOSEPH J. LAVIOLA, JR., Ph.D.

1    "interpolation between orientations"?

3        A.   So I'm given two orientations, and I

4    want to try to figure out an orientation in

5    between them, you can use -- quaternions can

6    make it somewhat easier to deal with that

7    from a mathematical standpoint.

8        Q.   Can you give me an example of two

9    different orientations and how you would

10   interpolate?

11       A.   Sure.  Let's say I have an

12   orientation along some arbitrary axis in

13   space -- okay? -- and there's a rotation

14   about that axis by 30 degrees, let's say, and

15   I have another orientation about another

16   arbitrary axis by 40 degrees and I want to

17   try to understand, for example, how to go

18   from that orientation to the second

19   orientation or I want to try to find an

20   orientation in between them, quaternions make

21   it easier to do that.

22       Q.   So besides the zero-to-360 ambiguity

23   and the interpolation between rotations, is

24   there another reason or another ambiguity

25   that quaternions address?

Page 50

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2            MR. RAFILSON:  Objection.  Form.

3        Objection.  Asked and answered.

4            You can answer.

5        A.    Yeah.  No.  That's the main reason.

6   BY MR. CHEN:

7        Q.    And quaternions are in the prior art

8   at the time of the invention of the '438

9   patent; is that correct?

10       A.    Yes.

11       Q.    So stepping forward again to the --

12  calculating the predicted axial

13  accelerations.  So the first step is the

14  first quaternion; is that correct?

15       A.    No.  Well, yes.  You take the first

16  quaternion, which is the prior quaternion,

17  and you use that in combination with the

18  angular velocity to calculate second

19  quaternion.

20       Q.    So what is the first quaternion?

21       A.    The first quaternion is -- if you

22  look at the patent, Figure 7, you'll see --

23  and number 710, the first quaternion is

24  actually the quaternion from the previous

25  state of the system or potentially the

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   initial -- initialized value that you use

3   when you start the filter or the comparison

4   method.

5        So that's what the first quaternion

6   is.  It's from the previous state of the

7   system.

8        Q.   Okay.  When you say "previous

9   state," what do you mean by the "state of the

10  system"?  What is the state of the system?

11       A.   The "state" is a term that's used to

12  describe where the current process is.  So,

13  like, in this particular algorithm, we've got

14  different moments in time that we're talking

15  about, and the state represents a particular

16  point in time.

17       Q.   So where the process is at that

18  particular point in time?

19       A.   It's sort of where it would be

20  considered what -- you know, where the

21  algorithm or the method is at some point in

22  time.  So at time T-1, as you can see from

23  the patent, is considered to be the previous

24  state -- right? -- which is really, you know,

25  just -- which is what -- this is a recursive

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     notation?

3          A.   Yes.

4          Q.   And that gives you an estimated

5     orientation at a new point in time?

6          A.   Yes.

7          Q.   And that's the second quaternion?

8          A.   Yes.

9               MR. RAFILSON:  Counsel, I'd just

10          like to note that there appears to be an

11          issue with the -- the '438 patent, it

12          appears to be generally fine, but some

13          of the -- some of the digits appear to

14          be filled in for some reason.  I don't

15          know that it makes a substantive

16          difference, but I just wanted to have

17          that on the record.

18               MR. CHEN:  Yeah.  I think it's

19          probably just a printing issue.

20     BY MR. CHEN:

21          Q.   So now that I have my second

22     quaternion, which is an estimated orientation

23     at a new point in time, I can use the

24     Equations 2, 3, and 4 to calculate a

25     predicted acceleration?

Page 58

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2        A.    Yes.

3        Q.    So Equation 2 is a calculation of a

4    predicted acceleration along the x-axis?

5        A.    Yes.

6        Q.    And then Equation 3 is the predicted

7    calculation acceleration along the y-axis?

8        A.    Uh-huh.

9        Q.    And then Equation 4 is a prediction

10   of -- predicted acceleration along the

11   z-axis?

12       A.    Yes.

13       Q.    Is what we've been talking about,

14   are those well-known concepts, or were they

15   well-known concepts at the time of the

16   invention of the '438 patent?

17           MR. RAFILSON:   Objection.   Form.

18       A.    The standard equations for -- the

19   differential equation for the quaternion and

20   the equations for computing these predicting

21   accelerations are fairly well-known in the

22   field.

23   BY MR. CHEN:

24       Q.    So Equation 2 would have been

25   well-known in the art at the time of the '438

Page 59

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2    patent's invention?

3               MR. RAFILSON:  Objection.  Form.

4        A.   Uh-huh.

5    BY MR. CHEN:

6        Q.   And Equation 3 would have been

7    well-known in the art at the time of the

8    invention of the '438 patent?

9               MR. RAFILSON:  Objection.  Form.

10       A.   Uh-huh.

11   BY MR. CHEN:

12       Q.   And Equation 4 would have been

13   well-known in the art at the time of the

14   invention of the '438 patent?

15              MR. RAFILSON:  Objection.  Form.

16       A.   (Nods head.)

17   BY MR. CHEN:

18       Q.   Is there any other way that the '438

19   patent discloses how to calculate a predicted

20   acceleration?

21              MR. RAFILSON:  Objection.  Form.

22       A.   This represents one potential way to

23   do it.  There may be others, but I'm not

24   aware of them.

25              ///

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   BY MR. CHEN:

3       Q.   Does the '438 patent disclose any

4   other potential ways of calculating the

5   predicted acceleration?

6            MR. RAFILSON:  Objection.  Form.

7       A.   No, not that I'm aware of.

8   BY MR. CHEN:

9       Q.   Let's go back to Claim 14, if you

10  will.  And, again, just for the record, we're

11  using Claim 14 as being representative of

12  Claim 19 as well.

13           The very lines -- Column 21, lines

14  33 to 38, it says, "Comparing the second

15  quaternion in relation to the measured

16  angular velocities . . . of the current state

17  at current time T with the measured axial

18  accelerations . . . and the predicted axial

19  accelerations . . . also at current time T."

20      A.   Yes.

21      Q.   How does the '438 patent disclose

22  doing this comparison?

23      A.   So it discloses it in a number of

24  ways.  First, if you go to the patent,

25  Figures 7 and 8, it shows the process by

1      JOSEPH J. LAVIOLA, JR., Ph.D.

2   which 735 -- it shows how it gets the second

3   quaternion, the measured axial acceleration

4   and the predicted axial acceleration, and

5   then it shows that you compare the two to

6   create a third quaternion.  Both 7 and 8 do

7   that.

8           The patent also mentions how to do

9   this, basically, through Columns 12, 13, and

10  14, which describe the whole process of going

11  from the first quaternion to the second

12  quaternion, to the measured angle

13  acceleration, predicted axial accelerations,

14  and then combining them together through

15  Equations 5 through 11 to get the updated

16  quaternion.

17      Q.   So in terms of the actual

18  calculations that you would use, which

19  equations would those be?

20      A.   The actual equations?  Turns out

21  it's going to be -- the actual equation that

22  will do the comparison is Equation 11.

23      Q.   Is this part of the extended Kalman

24  filter that you were talking about?

25      A.   Yes.

1      JOSEPH J. LAVIOLA, JR., Ph.D.

2      Q.   So Equations 1 through 4 are sort of

3  my process for getting current state and

4  predicted accelerations, and then Equations 5

5  through 11 are the Kalman filter?

6      A.   Okay.  So Equations 1 through 4 and

7  the measured acceleration are going to give

8  you the quaternion, the measured

9  acceleration, and predicted acceleration.

10 And those -- that piece right there will give

11 you data that is necessary to put into

12 Equations 5 through 11, which are the basic

13 equations of the extended Kalman filter.

14 Okay?  They're not the only equations --

15 right? -- because, remember, I said extended

16 Kalman filters are framework, so there are

17 other pieces that are associated with it.

18 Those pieces are being able to get the

19 appropriate data that you need to put into

20 the filter.  Okay?  Those pieces happen to be

21 Equations 1 through 4 and the measured axial

22 acceleration.

23          So those pieces, then, can be put

24 into the, quote/unquote, main equations of

25 the extended Kalman filter to get the

1       JOSEPH J. LAVIOLA, JR., Ph.D.

2   understand that -- the process model that is

3   described in Equation 1 would be utilized in

4   Equation 5.

5   BY MR. CHEN:

6       Q.   So you're saying -- and please

7   correct me again -- that these equations in

8   the '438 patent describe the '438 patent's

9   only disclosure of process model, but a

10  person of ordinary skill in the art would

11  know that there are other process models that

12  you can use?

13          MR. RAFILSON:   Objection.   Form.

14      Objection.   Misstates testimony.

15      A.   Anyone of ordinary skill in the art

16  would understand that these equations,

17  specifically Equations 5 through 11, are a

18  representative or a exemplary embodiment of

19  an extended Kalman filter and that there are

20  potentially other models that could be used.

21  BY MR. CHEN:

22      Q.   Are these other models in the '438

23  patent?

24      A.   No.

25      Q.   So a person of ordinary skill in the

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     art would know because there have been other

3     extended Kalman filters used?

4          A.    Uh-huh.

5          Q.    And that's well-known in the art?

6          MR. RAFILSON:    Objection.    Form.

7          A.    Yeah.    I mean, there's been a lot

8     of -- people have been using extended Kalman

9     filters for a while.    So there's a lot of

10    work on it.

11    BY MR. CHEN:

12         Q.    Do you know when extended Kalman

13    filters came around?

14         A.    To the best of my knowledge, they

15    came around sometime in the '60s.

16         Q.    Okay.    So going back to Equation 5,

17    then the left side is x(t\t-1)?

18         A.    Yeah.

19         Q.    What is -- is "t" time?

20         A.    Yes.    Well, it's time in integer

21    units.    So a lot of times, we don't -- we

22    talk about time as being actual time, you

23    know, minutes and seconds, so on.    But in

24    mathematics, we often describe time as simply

25    something that happened previously, something

Page 81

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     that happens currently, and something that

3     happens next.  Right?

4          So this is basically saying the

5     state at time given the previous time, the

6     current time given the previous time.  So, in

7     other words, it's saying the current state

8     given the previous state.

9     Q.   So is that like one hour, it's more

10    state, prior state --

11    A.   Yeah.

12    Q.   -- next state?

13    A.   Yeah.  I mean, in terms of

14    implementing it, you would want to know what

15    the actual time was because it does make a

16    difference.

17    Q.   So is t current state?

18    A.   Yes.

19    Q.   And then t-1 is prior state?

20    A.   Uh-huh.

21    Q.   And then you put that into a

22    function x.  What is the function x?

23    A.   The function x, it's not a function,

24    actually.  It represents the -- what is known

25    as the state vector.

Page 128

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2            And that is, in a sense, a type of

3   sensor fusion?

4        A.   Yes.

5        Q.   Because you're using the angular

6   velocities to create a first quaternion?

7        A.   Second quaternion.

8        Q.   Sorry.

9        A.   Yeah.

10       Q.   Second quaternion?

11       A.   I know it's confusing.   First,

12   second, third.

13       Q.   How else does the '438 patent

14   accomplish sensor fusion?

15           MR. RAFILSON:   Objection.   Form.

16       A.   Well, it also does it by -- you

17   know, Equation 11 is taking the quaternion

18   that is calculated from the process model,

19   and it's taking the quaternion that was

20   calculated using the predicted and measured

21   accelerations and combining them to get a

22   better estimate of the quaternion.

23           So in that sense, it's taking those

24   things and fusing them together in a way to

25   give you a better estimate of the quantity of

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2    interest.

3    BY MR. CHEN:

4        Q.    So when you say there -- it's taking

5    these two quaternions and combining them,

6    like we were talking about before, that means

7    assigning a weight and then choosing which

8    one --

9        A.    Well, you can assign a weight and

10   choose which one you prefer to use or you can

11   assign a weight and combine -- and actually

12   add them together, almost like a weighted

13   average.

14       Q.    And what does Equation 11 do?

15       A.    Equation 11 is -- Equation 11 is --

16   it's slightly unclear what Equation 11 is

17   doing.  But based on the mathematics in it,

18   it is either going to combine the two

19   measurements -- it is combining the two

20   measurements together, the quaternion from

21   the measurement and the quaternion from the

22   process, combining them and outputting that

23   quaternion with the weights from the

24   covariance matrix, or it's going to be

25   computing a new error term that can be used

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   to calculate the quaternion.

3             Either way, you are taking data from

4   different sensors and fusing them together.

5        Q.   I understand the combination, but I

6   think you were saying that combination in

7   this context can mean assigning a weight and

8   choosing which one you believe more or sort

9   of just adding them together, right?

10       A.   I mean, you can add; you can

11  subtract.  You know, there's a variety of

12  different ways that you can fuse them

13  together.

14       Q.   So what does Equation 11 actually

15  do?

16       A.   Equation 11 is -- looks like it's

17  assigning weights to each of the

18  individual -- it's assigning weights to the

19  process and model -- the process information

20  and the measurement information, and then

21  using that, it's subtracting the two

22  together, and that is going to give you data

23  which then can be utilized to create that

24  third quaternion.

25       Q.   So it's assigning a weight to the

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   some of what you need to plug in, that's

3   taught in Equations 5 through 11?

4        A.   I mean, it gives you, like -- for

5   example, it shows you you need this Q matrix,

6   and it shows you you need this R matrix,

7   right?  But it's up to the person

8   implementing it to determine what the best

9   way to do that is.  And anyone of ordinary

10  skill in the art would understand that.

11       Q.   So it's the '438 patent gives you

12  sort of a open-ended framework; is that

13  correct?

14       A.   Yes.

15       Q.   And what you add into the framework

16  is what makes it different from a plain and

17  ordinary extended Kalman filter?

18       A.   Yes.

19            MR. RAFILSON:  Objection.  Form.

20       A.   It represents a manifestation of the

21  extended Kalman filter.  Right?  And what you

22  do with it in this makes it different.

23            Every Kalman filter -- extended

24  Kalman is potentially different depending on

25  how you set it up and what data you have,

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     what process models and so on and so forth.

3     BY MR. CHEN:

4          Q.    So it's what you add into the

5     framework is what makes it different?

6          A.    Yes.

7          Q.    And the '438 patent gives you a

8     little bit about what you add into the

9     framework?

10         A.    Gives you most of it.

11         Q.    It gives you most of it in Equations

12    5 there through 11?

13         A.    Uh-huh.

14         Q.    And some of the --

15         A.    Well, actually, Equations 1 through

16    11.

17         Q.    Sorry.  Equations 1 through 11?

18         A.    Yeah.  You have to have Equations 1

19    through 4 in order to be able to populate

20    Equations 5 through 11.  If you don't have

21    that, then you don't know what your process

22    model would be.  In some sense, the patent's

23    description of the process model and the

24    measurement that you're getting is more

25    important than Equations 5 through 11

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2    themselves, because if Equations 5 through 11

3    are in the standard ordinary skill in the

4    art, people understand.  Right?  But what the

5    patent is doing is, is describing, you know,

6    how you're actually setting it up with the

7    current framework and the current set of

8    measurements and stuff.  That's where the

9    real difference lies in a standard extended

10   Kalman filter in its traditional form.

11       Q.   So Equations 1 through 4 give you

12   the setup that you plug into Equations 5

13   through 11 that make it different from

14   extended Kalman filter -- oh, sorry -- from,

15   like, a plain, ordinary extended Kalman

16   filter?

17       A.   Well, I mean, to say "plain,

18   ordinary extended Kalman filter," there's no

19   plain and ordinary extended Kalman filter.  I

20   mean, Kalman filter -- extended Kalman filter

21   is going to be unique depending on -- every

22   one of them is going to be slightly

23   different, depending on what you want to do

24   with it.

25       Q.   But all the underlying math of the

1      JOSEPH J. LAVIOLA, JR., Ph.D.

2   extended Kalman filter is known, right?

3           MR. RAFILSON:  Objection.  Form.

4      Objection.  Vague.

5      A.   So the standard equations, yes, are

6   known, right?  It's kind of like -- in

7   programming languages, very often there's --

8   there's a function in the C programming

9   language called qsort.  Okay?  And that

10  function runs a sorting routine.  It's a

11  well-known sorting routine, right?  But in

12  order to use it, you need a comparison

13  function to apply.  And any comparison

14  function may be different, right?

15          So even though you're using the

16  basics of a sorting algorithm, the sorting

17  algorithm is really technically different

18  every time because you're using a different

19  comparison method as input to it and even

20  different data.  So in that sense, it is

21  somewhat unique, depending on the parameters

22  that you provided.

23          In the same vein, we have a set of

24  parameters -- right? -- but not numbers.

25  Right?  Some of them are numbers, but some of

Page 156

1       JOSEPH J. LAVIOLA, JR., Ph.D.

2  own orientation; is that correct?

3       A.   Yes.

4       Q.   And one of those devices is a 3D

5  pointing device?

6       A.   That's right.

7       Q.   But it also gives other examples

8  like a motion detector; is that correct?

9       A.   Uh-huh.

10       Q.   And it gives a navigation equipment

11  example?

12       A.   Yes.

13       Q.   And it gives an example of a

14  communication device integrated with motion

15  sensors?

16       A.   Uh-huh.  That's correct.

17       Q.   So from your definition, what is the

18  difference between a motion detector and a 3D

19  pointing device?

20       MR. RAFILSON:  Objection.  Form.

21       A.   I suppose a motion detector is

22  something that will detect motion of

23  something.  3D pointing device is a device

24  that will calculate orientation so that it

25  can be utilized in a variety of different

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   ways from -- yeah.

3   BY MR. CHEN:

4        Q.   This says in the paragraph that

5   there's a number of devices that can

6   accurately calculate their own orientation,

7   and a 3D pointing device is one of them.

8        A.   Uh-huh.

9        Q.   So, for example, just a

10  communication device integrated with sensors,

11  that can calculate its own orientation?

12       A.   Yes.

13       Q.   So what's the difference between

14  that and a 3D pointing device?

15            MR. RAFILSON:   Objection.   Form.

16       A.   Well, the 3D pointing device is

17  being used for probably a specific function

18  over the communication device or the motion

19  detector.   The motion detector could be

20  simply to detect motion of a person --

21  communication device, so I know something

22  about where the device is located in the

23  world.   The difference is 3D pointing device

24  is actually something that's used in the

25  orientation to support a number of

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2    activities, including pointing and also

3    understanding -- or providing direction

4    and/or orientation information that can be

5    utilized to render graphical elements on a

6    screen so that they'll move with respect to

7    the device.

8    BY MR. CHEN:

9        Q.   Can I turn your attention to

10   Exhibit 2, which is your second declaration.

11       A.   Yes.

12       Q.   And can you look at paragraph 96 of

13   your second declaration.

14       A.   Yes.

15       Q.   So in this paragraph, you say, "The

16   '978 patent states 'in order to calculate the

17   resulting deviation, the computing processor

18   348 may utilize" --

19       A.   Wait a minute.  Wait a minute.  Wait

20   a minute.  Am I looking at the wrong thing

21   here?  You said Exhibit 2?

22       Q.   Yeah, the February 23rd.

23       A.   Exhibit 2, the 23rd.

24       Q.   I think that might be Exhibit 1, or

25   I might have my numbers wrong.

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2        A.    I have Exhibit 2 dated 2/23/2018,

3    paragraph 96.  "However, a person of ordinary

4    skill in the art would recognize that the

5    enhanced comparison method disclosed in the

6    '978 patent is designed to handle noise and

7    errors that would emanate from moving the 3D

8    pointing device."

9        Q.    Are you looking at paragraph --

10        A.    96.

11        Q.    96.  Yeah.  Right.  I just went to

12    the second sentence.

13        A.    Oh.  Okay.  '978 states, "In order

14    to calculate" -- okay.  Yes.

15        Q.    This is talking about using a

16    comparison or algorithm to eliminate the

17    errors of the first, second, and third signal

18    sets.  And the first signal set and the

19    second signal set and the third signal set,

20    those are what you get from the rotation

21    sensor, the accelerometer, and the

22    magnetometer?

23        A.    It's hard to say, just like

24    "negligible."

25        Q.    Magnetometer.

1       JOSEPH J. LAVIOLA, JR., Ph.D.

2       A.    Just a quick correction.   The order

3  that is presented in the patent is -- first

4  is accelerometer, second is magnetometer, and

5  third is rotation sensor.

6       Q.    Okay.   So you use the readings from

7  the sensors, and you utilize the comparison

8  method to eliminate the errors that are kind

9  of inherent in each one of those sensors?

10      A.    Uh-huh.

11      Q.    And then is that comparison method

12 in Equations 5 through 11 the same equations

13 that we've been talking about?

14      A.    Yes.

15            MR. CHEN:   Can you guys give me five

16      minutes to check my notes?

17            MR. RAFILSON:   Sure.

18            (Break taken from 1:53 p.m. to

19            2:03 p.m.)

20 BY MR. CHEN:

21      Q.    So just going back briefly to the

22 '978 patent and this comparison algorithm --

23      A.    Yes.

24      Q.    -- besides Equations 5 through 11,

25 are there calculations needed to do the

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2    comparison method disclosed anywhere else in

3    the '978 patent?

4         A.   Besides -- okay.  So you're asking

5    me is anywhere else besides Equations 5

6    through 11 a disclosure of the enhanced

7    comparison method '978 patent?  The answer to

8    that question is, actually, there's a small

9    addition that's somewhat separate from

10   Equations 5 through 11, and they are

11   Equations 26 through 28.

12          So Equations 26 through 28 will

13   provide orientation -- an estimate of

14   orientation based on the accelerometer and

15   the magnetometer, given that the device is

16   stationary.  So that, in and of itself,

17   provides an additional component to enhance

18   the comparison method.  It's an either/or

19   proposition essentially.  You can use this or

20   you can use the enhanced comparison method to

21   get the orientation.

22        Q.   It's either/or?

23        A.   Well, the problem is, is that if the

24   device is moving -- well, let me put it to

25   you this way:  These equations will work if

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2    the device is stationary, you know, just

3    holding it like this.

4          Q.    And just to clarify, Equations 26

5    through 28?

6          A.    Yes.

7          Q.    Okay.

8          A.    But if the device is moving and/or

9    we want to use the gyroscope, then the

10   enhanced comparison method would include

11   Equations 5 through 11.  So the small little

12   addendum to the enhanced comparison method.

13         Q.    So this is just in the event that

14   the device is not moving and we don't want to

15   use a gyroscope -- let's just do 26, 27, and

16   28 -- that gives us an estimate of

17   orientation?

18         A.    Yes.

19         Q.    But if the device is moving or we

20   want to use the gyroscope, we have to go back

21   to that extended Kalman filter --

22         A.    Yes.

23         Q.    -- in 5 through 11?

24         A.    Uh-huh.

25         Q.    Is there any other disclosure of the

Page 163

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2    '978 patent's enhanced comparison method in

3    this specification?

4            MR. RAFILSON:  Objection.  Form.

5        A.   Aside from described -- from using

6    the term enhanced comparison method, the

7    various places throughout the patent and

8    describing what it's for and why it's needed

9    and the Figures 7 and 8, no.

10   BY MR. CHEN:

11       Q.   So I assume you're being paid an

12   hourly rate for your work?

13       A.   Yes, uh-huh.

14       Q.   What is that hourly rate?

15       A.   375 an hour.

16       Q.   375?

17       A.   Yes.  375, not $3.75.

18       Q.   Do you keep track of the hours you

19   work?

20       A.   Yes, I do.

21       Q.   Do you know approximately how much

22   time you've spent so far?

23       A.   Off the top of my head, I would say

24   maybe 70, 80 hours, something like that, at

25   this point.

1         JOSEPH J. LAVIOLA, JR., Ph.D.

2         A.    In the '978 patent, I don't think it

3    needs to be construed; but if it does, it

4    would be construed as a handheld device that

5    includes at least one or more accelerometers

6    and a magnetometer and, optionally, a

7    rotation sensor comprising one or more

8    gyroscopes and uses them to determine

9    deviation angles or the orientation of a

10   device.

11        Q.    Okay.  I want to refer you to

12   Exhibit 4.  And for the record, what is

13   Exhibit 4 again?

14        A.    That's the '978 patent.

15        Q.    Okay.  And what's the title of

16   the -- of Exhibit 4?

17        A.    "3D Pointing Device and Method for

18   Compensating Rotations of the 3D Pointing

19   Device Thereof."

20        Q.    And I'd like to refer you to a

21   portion of text counsel referred you to

22   earlier today.  Would you turn to the bottom

23   of Column 3 of Exhibit 4.

24        A.    Okay.  Yes.

25        Q.    And do you see the text that refers

1       JOSEPH J. LAVIOLA, JR., Ph.D.

2   to a navigation device, motion detector, or a

3   communication device?

4       A.   Yes.

5       Q.   Would you read that sentence for the

6   record, please.

7       A.   Okay.  "In addition, as the trend of

8   3D technology advances and is applicable to

9   various fields including displays,

10  interactive systems and navigation, there is

11  a significant need for an electronic device,

12  including, for example, a motion detector, a

13  3D pointing device, a navigation equipment,

14  or a communication device integrated with

15  motion sensors therein, capable of accurately

16  outputting a deviation of such device readily

17  useful in a 3D or a spatial reference frame.

18      Q.   Thank you, Dr. LaViola.

19           And how, if at all, is a 3D pointing

20  device different from a navigation device?

21      A.   It's not necessarily different.

22  It's -- could be integrated within.  In fact,

23  if you look at Figure 6 in the '978 patent,

24  it's a picture of a -- effectively, a

25  smartphone or navigation equipment and was an

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2   exploded diagram that shows an embodiment of

3   electronic device, the present invention,

4   such as a smartphone or navigation equipment,

5   utilizing a nine-axis motion sensor module

6   according to anther embodiment of the present

7   invention.

8        Q.   I'm sorry, Dr. LaViola.  What text

9   are you reading?

10       A.   This is Figure 6 on the '978 patent,

11   Column 8, row 37 to 43.

12       Q.   Okay.  How, if at all, is a 3D

13   pointing device different from a motion

14   detector?

15            MR. CHEN:  Object to the form.

16       A.   It isn't necessarily different from

17   a motion detector.  It can be used as a

18   motion detector.

19   BY MR. RAFILSON:

20       Q.   How, if at all, is a 3D pointing

21   device different from a communication device?

22            MR. CHEN:  Object to form.

23       A.   It could be used as a motion -- as a

24   navigation device as well, or included within

25   it.

1        JOSEPH J. LAVIOLA, JR., Ph.D.

2    BY MR. RAFILSON:

3        Q.   Dr. LaViola, I want to clarify my

4    question.  I said, "How, if at all, is a 3D

5    pointing device different from a

6    communication device?"

7        A.   Oh, I'm sorry.

8             MR. CHEN:  Object to form.

9        A.   Yes, it could also be included as

10   part of a communication device as well, 3D

11   pointing device.

12   BY MR. RAFILSON:

13       Q.   I'd like to refer you to Equation 11

14   of the '438 patent.  That's Exhibit 3.  So

15   that is -- look at Column 14, please.

16       A.   Yes.

17       Q.   There was some testimony about

18   Equation 11 earlier today, right?

19       A.   Yes.

20       Q.   How, if at all, were you familiar

21   with Equation 11 before this case?

22       A.   I was familiar with the general

23   concept of Equation 11 but not the actual

24   equation itself.

25       Q.   So we talked earlier about the scope

1          JOSEPH J. LAVIOLA, JR., Ph.D.

2     of the claims.  How, if at all, do you

3     believe that the claims require that

4     Equation 11 be used?

5          A.   I don't believe that the -- that it

6     requires Equation 11 to be used at all.  It

7     can be used -- there are other equations that

8     are similar that can be used in its place to

9     maintain the enhanced comparison method.

10              MR. RAFILSON:  Thank you,

11         Dr. LaViola.  I have no further

12         questions.

13                   REDIRECT EXAMINATION

14     BY MR. CHEN:

15         Q.   Dr. LaViola, during the most recent

16     break, did you confer with CyWee's counsel,

17     Ari Rafilson?

18              MR. RAFILSON:  I would advise,

19         Counsel, not to disclose the contents of

20         any particular communications.

21         Otherwise, he can discuss generally that

22         we spoke together.

23              MR. CHEN:  So you're saying the

24         contents are not discoverable?

25              MR. RAFILSON:  That is what I'm

Page 176

1                    C E R T I F I C A T E

2    STATE OF FLORIDA:

3

4              I, RHONDA HALL-BREUWET, RDR, CRR,

5    LCR, CCR, FPR, CLR, NCRA Realtime Systems

6    Administrator, shorthand reporter, do hereby

7    certify:

8              That the witness whose deposition is

9    hereinbefore set forth was duly sworn, and that

10   such deposition is a true record of the

11   testimony given by such witness.

12             I further certify that I am not

13   related to any of the parties to this action by

14   blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto

17   set my hand this 8th day of March, 2018,

18

19   _____

20   RHONDA HALL-BREUWET, RDR, CRR, LCR, CCR, FPR, CLR,

21   NCRA Realtime Systems Administrator

22   Shorthand Reporter

23

24

25